### THOMPSON et ux. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6550.

United States Court of Appeals
Fourth Circuit.

Argued March 20, 1953.

Decided April 7, 1953.

Boris Kostelanetz, New York City (Corcoran & Kostelanetz and Rexford E. Tompkins, New York City, on brief), for petitioners.

Walter Akerman, Jr., Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack, Sp. Asst. to Atty. Gen., on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Petitioners, who are husband and wife, appeal to us from a decision of the Tax Court, entered July 14, 1952, which sustained a determination by the Commissioner of a deficiency of $18,503.88 in the income tax of petitioners for 1946.

From April 1, 1939, through February 1, 1946, Thomas Thompson, hereinafter referred to as the petitioner, was employed by Virginia Shoe Company of Fredericksburg, Virginia, hereinafter referred to as the employer, as a traveling salesman. Beginning June 15, 1942, the employer paid the petitioner $5,000 a year. In January, 1943, the petitioner protested to the secretary-treasurer of his employer that the company owed him between $20,000 and $25,000 in accrued commissions and demanded that his pay be increased. The employer informed the petitioner that due to the "wage freeze" it could not increase the petitioner's pay. On October 1, 1943, after petitioner's continued complaints, the employer increased the pay of the petitioner to $1,000 per month, gave him additional territory and designated him as sales manager. Between October 1, 1943, and February 1, 1946, he made continued requests for accrued commissions accumulated in the intervening years. The employer persisted in refusing to pay on the excuse that this was impossible because of the "wage freeze."

The company was without new orders for shoes in March, 1942, and was facing the possibility of closing down when existing orders had been filled. It was agreed between the petitioner and the secretary-treasurer of the company that petitioner would attempt to obtain orders for shoes in New York, which was outside his regular territory. He secured an order from W. H. Miles Shoe Company for about 30,000 or 35,000 pairs of shoes by April 15 at an average price of about $1.90 a pair, an order for 25,500 pairs of shoes from Melville Shoe Company at about $1.62½ a pair, an order for 12,000 or 14,000 pairs of shoes at about $1.90 a pair from Allied Purchasing Corporation which operated a chain of department stores and, in the fall of 1942, an order from Montgomery Ward for 7,000 or 8,000 pairs of shoes.

The company decided to discharge the petitioner as of February 1, 1946, and gave him a letter of resignation to sign, together with a check for $3,000 intended to represent separation pay. He refused to resign

and the company discharged him on February 1, 1946.

The petitioner then employed a lawyer from New York under an agreement to pay the lawyer one-fifth of any sum recovered, whether by suit, settlement or otherwise. The petitioner explained the situation to the lawyer, returned to the company's place of business on February 18 with the lawyer, there met with the secretary-treasurer and president of the company, and demanded payment of about $125,000, representing alleged past due commissions for the years 1942 up to February 1, 1946. This demand seems to have flabbergasted the secretary-treasurer of the company. The taxpayer threatened immediate court action if he was not paid and, after a long discussion in which the representatives of the company denied that it owed any commissions to taxpayer, the company paid him $60,000 in a compromise settlement. The taxpayer paid his lawyer a fee of $12,000 for assisting him in the controversy.

The company never conceded that it owed petitioner anything for unpaid commissions and never accrued any such commissions on its books during those years. The petitioner never instituted any legal proceedings against the company in connection with his claim. No bankruptcy or receivership of the company occurred at any time material hereto.

$60,000 was more than 15% of petitioner's income for the year 1946. Out of the $60,000, the petitioner paid his attorney $12,000. The net amount of $48,000 was allocated by the petitioner pursuant to Section 107(d)(2)(A)(iv) of the Internal Revenue Code. Of this $48,000, the petitioner included $13,898.60 in his return for 1946, which was the year of receipt, and allocated the remaining amount of $34,101.40 to the prior years of 1942 through 1945. The Commissioner, in determining the deficiency, added this sum of $34,101.40 to the income reported for 1946 with the explanation "that the net amount of $51,838.08 received by you in 1946 from the Virginia Shoe Company (corporation) represents taxable income in that year and your net income has accordingly been increased $34,101.40." The Tax Court sustained the determination of the Commissioner.

■ The Tax Court found that the employer "paid Thompson the $60,000 in order to avoid the expense, annoyance and uncertainty of a law suit and to avoid the ill will in the trade which would result from a salesman's suit for commissions." We cannot sustain this finding. There was a real dispute here and it hardly seems plausible that the employer, a relatively small corporation, would pay out $60,000 which it had to borrow, solely for the reasons set out by the Tax Court. There is every reason for thinking that the corporation paid this $60,000 because it thought that petitioner's claim had merit and that, in case a suit was brought, petitioner would probably recover that amount or more.

Section 107(d) of the Internal Revenue Code, 26 U.S.C.A. § 107 reads:

"(d) *Back pay.*

"(1) *In general.* If the amount of the back pay received or accrued by an individual during the taxable year exceeds 15 per centum of the gross income of the individual for such year, the part of the tax attributable to the inclusion of such back pay in gross income for the taxable year shall not be greater than the aggregate of the increases in the taxes which would have resulted from the inclusion of the respective portions of such back pay in gross income for the taxable years to which such portions are respectively attributable, as determined under regulations prescribed by the Commissioner with the approval of the Secretary.

"(2) *Definition of back pay.* For the purposes of this subsection, 'back pay' means (A) remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events; (i) bankruptcy

or receivership of the employer; (ii) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; (iii) if the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay such remuneration; or (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary; and (B) wages or salaries which are received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which constitute retroactive wage or salary increases ordered, recommended, or approved by any Federal or State agency, and made retroactive to any period prior to the taxable year; and (C) payments which are received or accrued during the taxable year as the result of an alleged violation by an employer of any State or Federal law relating to labor standards or practices, and which are determined under regulations prescribed by the Commissioner with the approval of the Secretary to be attributable to a prior taxable year. Amounts not includible in gross income under this chapter shall not constitute 'back pay.' "

We append the Treasury Regulation:

"SEC. 29.107-3 (As added by T.D. 5389, 1944 Cum.Bul. 196, 197.) *Back Pay Attributable to Prior Taxable Years*—Section 107(d)(2) defines 'back pay' and section 107(d)(1) limits the amount of tax resulting from the inclusion of such back pay in gross income for the year in which it is received or accrued. Back pay includes compensation, wages, salaries, pensions, and retirement pay received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year but for the intervention of one of the following events: (1) bankruptcy or receivership of the employer; (2) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; (3) if the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay such remuneration; or (4) any other event determined to be similar in nature under these regulations. As to what constitutes bankruptcy and receivership proceedings see section 29.274-1.

"An event will be considered similar in nature to those events specified in section 107(d)(2)(A)(i), (ii), and (iii) only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment, except for such circumstances, would have been made prior to the taxable year in which received or accrued. For the purposes of this section the term 'back pay' does not include remuneration which is deemed to be constructively received in the taxable year or years in which the services were performed, remuneration paid in the current year in accordance with the usual practice or custom of the employer even though received in respect of services performed in a prior year or years, additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation, or any amount which is not includible in gross income under Chapter 1. * * * "

Clearly here, in order that the petitioner may allocate, he must bring his case within § 107(d)(2)(A)(ii) "dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings;" or § 107(d)(2)(A)(iv) "any other event de-

termined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary".

The Treasury Regulation repeats the events contained in the statute, then adds:

"An event will be considered similar in nature to those events specified in section 107(d)(2)(A)(i), (ii), and (iii) only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment except for such circumstances, would have been made prior to the taxable year in which received or accrued."

Are the events here included in the provision of the Regulation (which refers to the Statute): "if the circumstances are unusual, if they are of the type specified therein?" In other words, are these events—the disputed claim for commissions, the excuse for non-payment offered by the employer (the freezing of wages which, it seems, was not a valid excuse), the hiring of a lawyer on a contingent fee by petitioner, the negotiations between the petitioner and his lawyer and the officers of the employer, the threat of court proceedings which seems to have been real, the compromise settlement, the payment of the sum agreed upon to the petitioner and the signing by him of a release, the payment by petitioner to his lawyer of $12,000,— taken in their entirety, similar in nature to the "commencement of court proceedings?" We think they are and that the decision of the Tax Court must be reversed.

There must be some situations similar in nature to the commencement of court proceedings; otherwise, Congress has used meaningless words. Such an event, for example, we think, would be the reference of petitioner's claim against the employer to private arbitration.

The only appellate decision in point seems to be the case of Langer's Estate v. Commissioner, 9 Cir., 183 F.2d 758. In that case, a hotel corporation withheld the salaries of certain of its officers and applied the money so far as it would go to the payment of its mortgage indebtedness during a period in which the corporation was insolvent and unable to pay its mortgage debt in full, and the mortgagee refrained from foreclosure, believing that the business was being honestly conducted and the debt would finally be paid. Circuit Judge Lindley said, 183 F.2d at page 760:

"Under these findings, it is quite clear to us that the event which operated to defer the payment of the salaries of Langer and Lindsey was an event similar in nature to bankruptcy or receivership, for Commodore, during the years in question, was admittedly insolvent and was operating only at the sufferance of Pacific, which was, at all times, in a position to foreclose its deed of trust and mortgage on the hotel and its furnishings and, in fact, refrained from doing so inasmuch as it appeared that all available revenues were being applied by Commodore toward the payment of its indebtedness to Pacific rather than toward the payment of salaries to the corporate officers. If the situation in which Commodore found itself was not one similar to 'bankruptcy or receivership' within the meaning of the Code, Section 107(d) (2), and the Regulations (Treasury Reg. 111, Section 29.107–3), then those statutory words have no meaning, for the only element of legal bankruptcy lacking was a formal judicial declaration,—a determination which the corporation or its creditors could have procured at any time,—and it is obvious that to require such an official determination would be equivalent to saying that the only event similar to bankruptcy is bankruptcy itself."

This decision was accepted by the Tax Court and put into effect. See, 16 T.C. 41.

In Dingwall v. Commissioner, decided by the Tax Court August 5, 1952, (1952 P–H T.C. Memorandum Decisions, pars. 52, 247), now pending on petition for review in the United States Court of Appeals for the Second Circuit, the decision in the case before us was cited and approved. Said Judge Hill:

"He (petitioner) maintains that his action in hiring an attorney, whom he

authorized to commence suit, and in threatening court action unless his demand for back pay was satisfied, constituted an event similar to 'dispute as to the liability of the employer to pay such remuneration which is determined after the commencement of court proceedings.' * * * We believe that the petitioner's position in this respect is untenable."

Counsel for petitioner, in both oral argument and brief, earnestly contend that court proceedings here could easily have been commenced but that these proceedings would have been a mere formality and would not have led to any more favorable settlement. We think there is real force in this argument. Had such a suit been filed just before the settlement negotiations and had it been dismissed (even without service of process) immediately after the settlement, very clearly the statute would have been literally fulfilled.

██ The statute is remedial in nature and should be liberally construed to give effect to its intention to protect an employee, who has been denied payment of his wages when they were due, from the payment of a heavier tax than would have been imposed if the employer had promptly met his obligations. The statute also protects the government by providing that there must be a dispute, and the genuineness of this dispute is assured by the provision that the determination must be made after the commencement of court proceedings or an event similar in nature.

In Sovik v. Shaughnessy, D.C., 92 F. Supp. 202, 205, affirmed, 2 Cir., 191 F.2d 895, District Judge Brennan, construing Section 107(a) of the Internal Revenue Code, said:

"That the statute is remedial and that the purpose thereof is to relieve the taxpayer against the inequity of taxing in one year the fruits of several years of service is plain and needs the citation of no judicial precedent for its authority."

See, also, Bonwit Teller & Co. v. United States, 283 U.S. 258, 51 S.Ct. 395, 75 L.Ed. 1018; United States v. Merriam, 263 U.S. 179, 44 S.Ct. 69, 68 L.Ed. 240; Kimbrell's

Home Furnishings, Inc. v. Commissioner, 4 Cir., 159 F.2d 608.

We must decide whether we are obliged to interpret the ameliorating phrase of the statute with great strictness and thus deprive the petitioner of relief, or whether we shall follow the lead of Judge Lindley in Langer's Estate v. Commissioner, supra. He held that the circumstances of the case before him were similar to bankruptcy or receivership although no court proceedings were instituted. A decision against the petitioner in the pending case would seem to be in conflict with the spirit of the statute and with the decision of the Ninth Circuit. Certainly, the equities here all favor the petitioner. We prefer to be disciples of the spirit rather than the letter, to be liberal rather than strictly formalistic. *Qui haeret in litteris, haeret in cortice.*

In Black's Law Dictionary (3d Ed. page 1630), citing many cases, the word "similar" is defined as meaning: "Nearly corresponding, resembling in many respects, somewhat like, having a general likeness." Under such a definition, the events in this case would seem to be "similar" to the "commencement of court proceedings." See, also, Ballentine, "Law Dictionary with Pronunciations," page 1203.

The decision of the Tax Court of the United States is reversed.

Reversed.