### SEDLACK v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 10622.

United States Court of Appeals Seventh Circuit.

April 30, 1953.

Alexander J. Strom, Belvidere, Ill., John A. Strom, Belvidere, Ill., for petitioners.

H. Brian Holland, Asst. Atty. Gen., Joseph F. Goetten and Ellis N. Slack, Sp. Assts. to Atty. Gen., for respondent.

Before MAJOR, Chief Judge, and FINNEGAN and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

Albert L. Sedlack was employed by Burson Knitting Company (sometimes referred to as Burson or the company) in 1928, and continued in such employment until his death on November 9, 1946. In October 1945, the company authorized the payment to him of $18,000, $12,000 being paid in 1945 and $6,000 in 1946, which payments were in addition to his regular salary. Sedlack and his wife Elsie were on the cash basis of accounting for tax purposes. In their joint income tax returns for such years they reported the payments thus received by Sedlack as back pay to be allocated over the years from 1942 to 1945, inclusive. The Commissioner of Internal Revenue determined deficiencies on the basis that the payments thus received by Sedlack did not constitute back pay and, consequently, should have been included in gross income for the years in which they were received. The Tax Court sustained the Commissioner's determination. 17 T.C. 791. The matter is here for a review of such determination.

As the title indicates, there were a number of proceedings occasioned by the death of Sedlack which were consolidated before the Tax Court. In the state of the record, we discern no occasion to describe or comment upon these separate proceedings because it is conceded that the question for decision is the same as that which would have arisen had Sedlack lived and attacked the deficiencies in his own right.

The contested issue is whether the Tax Court properly sustained the deficiencies as determined by the Commissioner on the premise that the compensation of $18,000 received by Sedlack in 1945 and 1946 did not constitute "back pay," as defined by section 107(d) (2) (A) of the Internal Revenue Code, 26 U.S.C. § 107(d) (2) (A). This section defines "back pay" as meaning "remuneration, including wages, salaries

* * * and other similar compensation, which is received * * * during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events; (i) bankruptcy or receivership of the employer; (ii) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; * * * or (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary * * *."

Treasury Regulations 111, Section 29.107–3, entitled "Back pay attributable to prior taxable years," provides: "An event will be considered similar in nature to those events specified in section 107(d) (2) (A) (i), (ii), * * * only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment, except for such circumstances, would have been made prior to the taxable year in which received or accrued." The regulation proceeds to enumerate various situations in which remuneration is not to be considered as "back pay," including "additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation."

█ Inasmuch as we have reached the conclusion that the decision of the Tax Court is erroneous, we feel obligated to relate the situation in more than ordinary detail. The record, in our judgment, contains much material without probative value. It is a hodgepodge affair, due perhaps to the fact that Burson kept few if any records. Only two witnesses of any consequence were heard, both presented by petitioners, namely, Ralph Hinchliff and Ralph S. Williams. The former had been connected with the company for thirty-eight years, and served as its president from 1925 to 1947, when he became chairman of its board of directors. The latter was employed in April 1932, became vice president, and served in that capacity until 1947, when he succeeded Hinchliff as president.

As noted, Sedlack was employed by Burson in 1928. On September 13, 1930, he entered into an agreement whereby his annual salary as sales manager was fixed at $12,000 for 1931, $13,000 for 1932, and $14,000 for 1933. In June 1932, because of the depressed condition of the company's business, a serious shrinkage of its cash position, and an outstanding bond issue of $500,000, due in 1935, the company was compelled (as found by the Tax Court) to reduce salaries of all of its officers and some of its employees, including Sedlack. As a result of this reduction, Sedlack received less than $12,000 in 1932, and $6,000 in 1933. The Tax Court found that Hinchliff, the president of the company, "had general conversations with employees who took salary cuts, including Sedlack, assuring them that they would eventually be recompensed for their sacrifices." This finding is accurate as far as it goes but it does not tell the whole story. Hinchliff testified that he agreed with Sedlack not only that the latter would be paid a salary of $14,000 for 1933, but that he would be paid that salary "as long as he was delivering the goods in sales for the Burson Knitting Company." When asked if Sedlack delivered the goods after that, Hinchliff answered, "He was terrific." He testified that he had an agreement with Sedlack "that when the bonds were paid off, the owners got a return on their money, and the company's position justified it, we would restore his salary, bring his salary to the $14,000 figure. We did it with ourselves." He also testified that at a meeting of the board of directors in 1945, it was agreed to pay Sedlack $18,000 back salary. On cross examination, with reference to that meeting, he stated, "Sedlack's case was stated, and different angles, different people expressed themselves, and it was agreed that the claim was justified and should be paid." It is this promise by Hinchliff, made in 1932, recognized by him at different times during the intervening years, and which, according to his testimony, culminated in affirmative action by the board of

directors in 1945, that petitioners rely upon as an agreement on the part of the company to restore Sedlack's salary.

On June 29, 1945, the company by its vice president Williams wrote to the Stabilization Unit of the Bureau of Internal Revenue relative to Sedlack's salary. Attached to this letter are certain documents reviewing the work and salary record of Sedlack during the period of his employment, including the following memoranda:

"September 14, 1930

"Late yesterday evening (6:30 P. M.) Ralph Hinchliff and Delos E. Prescott, President and Secty-Treasurer respectively of Burson Knitting Company and Myself agreed to this 3 year contract with my salary for years 1931, 1932 and 1933 as follows: [then follows the salary agreement for those years, as previously related.] The payroll book of the Treasurer was duly signed immediately by Delos E. Prescott and Albert Sedlack (initialed by both to 4–13–1930)."

"This salary contract is renewed by agreement and affirmation of the contracting parties hereof for payments to Albert Sedlack of $14000.00 annual salary when the annual sales and earnings of the company are again equal to the year 1930 and the outstanding bonded indebtedness of the company is retired. and when the stockholders again receive dividends.

"A. L. S."

The latter memorandum, together with the initials, was shown to have been in the handwriting of Sedlack. Its date is not shown but it appears probable that it was written about the time of the expiration of the three-year agreement to which it was attached. At any rate, it was offered by the Commissioner as a document found in the files of the company. Furthermore, during the examination of Williams, a question arose as to Hinchliff's testimony relative to his agreement with Sedlack. The court at that time observed:

"I understand he [Hinchliff] testified that the readjustment was made, and there was some understanding with Mr. Sedlack that if and when the corporation got prosperous, the salaries would be made such as would take up the difference between what had been received and $14,000."

The testimony of Hinchliff as to his agreement with Sedlack is hardly mentioned by the Tax Court in its findings or by the Commissioner in his brief here. Instead, reliance is placed upon the testimony of Williams in support of the finding that no such agreement existed. We realize it is the function of the Tax Court to weigh the conflicting evidence, but we discern no reason why the testimony of Hinchliff should be ignored. Further, the testimony of Williams, while confusing and in some respects contradictory, does not impeach or contradict that of Hinchliff that an agreement was made. In fact, Williams was not employed by the company until 1932, and he admitted that he did not hear of the agreement of September 1930, the existence of which is conceded by all, until 1933. True, he denies that he ever promised to pay Sedlack $14,000 per year, but admits that he might have talked to him about it. He does not deny, and there is no competent evidence in the record to dispute the fact that such an agreement existed between Hinchliff and Sedlack, by which the latter's salary was to be restored to $14,000 on the contingencies stated. He did testify that in 1944, "I first became aware that there was an understanding between Mr. Hinchliff and Mr. Sedlack regarding the basis here" (referring to the $14,000 promise). And regarding the directors' meeting which was attended by Williams and at which the $18,000 payment to Sedlack was authorized, Williams stated, "Mr. Hinchliff was rather obscure about this whole arrangement, but eventually he convinced me there was merit to it."

The Tax Court found that salary negotiations with Sedlack were conducted by Williams from 1937 through 1946. Certain matters which took place during that period are relied upon by the Tax Court, apparently for the purpose of showing that no agreement existed between Sedlack and Hinchliff relative to the restoration of the $14,000 salary. It should be pointed out that the company suffered net losses each year from 1930 to 1938, inclusive. In 1939, for the first time, it showed a small net

profit, and by 1942, its net profit was more than $147,000, and it was that year when its net sales for the first time exceeded its net sales for 1930. During those years Sedlack, with his salary reduced to $6,000 in 1933, received little or no increase. It is shown quite plainly, however, that Sedlack was consistent, after 1937, in attempting to persuade Williams to increase his compensation. On December 21, 1937, he was paid $2,000 as added compensation for prior years. In a letter to the company acknowledging receipt of this amount Sedlack stated, "While I have talked of legal claims regarding compensation, I assure you these are out and are hereby waived. I trust the yearly future earnings of the company will permit it to add to my compensation and I am leaving this to your sense of fairness."

On May 28, 1943, the company, by Williams, wrote the Stabilization Unit, stating:

"Every year since 1934 Mr. Sedlack has presented a claim for the salary that was unpaid to him during the years 1932 and 1933 * * *. The matter was again brought up by him early this month and to avoid threatened litigation, the Company on May 15 has agreed to pay Mr. Sedlack $5,000.00 in complete settlement of this claim and this he has agreed to."

The Stabilization Unit, in authorizing such payment, in its letter to the company of June 22, 1943, stated:

"* * * It is understood that this payment constitutes a settlement of an obligation with respect to reduction of Mr. Sedlack's salary for the year 1932 and 1933, and is not for current earnings of this employee."

Sedlack, upon receipt of the sum of $5,000, entered into an agreement with the company, releasing it from all liability for claims existing at that time. It is not discernible how these settlements made for the express purposes related tend in any manner to contradict or impeach the agreement between Hinchliff and Sedlack for a restoration of his salary at the $14,000 level when the conditions stated were met.

Another letter, written to the Stabilization Unit by Williams on November 29, 1944, is relied upon by the Tax Court, in which it was stated:

"On September 13, 1930, this Company made an Agreement with Mr. Albert L. Sedlack, the Sales Manager of the Company, which provided for salary payment to him of $14,000 annually, beginning January 1, 1933."

This letter reviews the reasons for the reduction in Sedlack's salary and the settlement of his salary claim for the years 1932 and 1933 for $5,000, and continues:

"Mr. Sedlack has insistently maintained that the above settlement was subject to and dependent on the fulfillment by the Company of the terms of the salary agreement, and that he did not waive the Company's contractual liability in his agreement to the settlement of May 29, 1943 which affected the unpaid amounts due him for the years 1932 and 1933, that he was given assurance by the president of the Company repeatedly during the years 1938, 1940, and 1941 that the salary of $12,500.00 a year would be reinstated under this contract as soon as the sales and earnings of the Company were again equal to the year 1930 and when the outstanding bonded indebtedness of the Company was retired and when the stockholders again received dividends."

If this letter has any probative value it affirms rather than contradicts the premise that there was an agreement to restore Sedlack's $14,000 annual salary. True, as is pointed out, Williams in this letter stated that the agreement called for $12,500 per year rather than $14,000. Williams admitted, however, that he changed the $14,000 figure claimed by Sedlack to the $12,500 figure, and this apparently without Sedlack's knowledge or consent. This request was denied by the Stabilization Unit. Thereupon, on December 1, 1944, Williams wrote Sedlack that the request made to the Stabilization Unit was based upon Sedlack's contentions and statements and that the writer "wants it clearly under-

stood that the Company in this request does not admit there exists any basis or grounds for your contentions and claims." There is no proof that Sedlack received or saw this letter, but even if he did, it is not in contradiction or impeachment of the agreement made between Hinchliff and Sedlack.

The Tax Court found:

"In October 1945, the Company decided to pay Sedlack $18,000 in addition to his regular .salary, $12,000 being paid in 1945 and $6,000 in 1946. The $18,000 was paid to Sedlack on a retroactive basis in recognition of prior services to the Company, but not to settle an outstanding legal obligation. After the 1943 second release and payment of $5,000, the Company reasonably believed Sedlack had no prior salary claims. The $18,000 paid to Sedlack in 1945' and 1946 was to bring his compensation up to $14,000 for each of the years 1942, 1943, 1944, and 1945. The Company had no obligation during any of the years 1942, 1943, or 1944 to pay Sedlack any compensation in excess of the amounts he actually received."

This finding is to us confusing and in some respects beside the issue. It appears to recognize the fact that Sedlack was paid $18,000 as increased remuneration for the years 1942, 1943, 1944 and 1945. It is not discernible how it could be properly characterized as other than back pay for those years. It is pertinent to note that the $18,000 as allocated by Sedlack brought his salary up for each of those years to $14,000, which was in accordance with the promise made him by Hinchliff. It is not even intimated that the payments were authorized as a bonus or a gratuity, and there is no reason to think that they were made out of the goodness of the company's heart. But the court finds that they were not made "to settle an outstanding legal obligation." We think this is irrelevant. The treasury regulation precludes back pay for past services in the absence of a "prior agreement or legal obligation." The Tax Court made no finding that the payments were not made as the result of a "prior

agreement." We think they were thus made. It is, therefore, of no consequence that they were not made as a result of a "legal obligation," as found by the court. The statement in the court's finding that after the payment of $5,000, "the company reasonably believed Sedlack had no prior salary claims," is of dubious propriety, to say the least. This could only refer to a belief entertained by Williams, not a belief by Hinchliff. As we have shown, Sedlack's agreement was with the latter and, while Williams at times appears to have disputed that there was such an agreement, he in the end recognized its merit and gave his approval to its performance. It is evident that neither the $5,000 payment nor the release signed by Sedlack had any connection with or relation to the agreement between Hinchliff and Sedlack.

Holding as we do that the $18,000 was paid to Sedlack in back pay as the result of an agreement, we are still met with the serious contention that, even so, payment was not previously prevented by an event similar to "bankruptcy or receivership" of the company, or an event similar to a "dispute as to liability determined after the commencement of court proceedings." On this issue the Tax Court found:

"Furthermore, had there been any additional liability for compensation to Sedlack in 1942, 1943, or 1944 the evidence shows that petitioner [the company] could have paid it. In fact, by April 1942, adequate funds were on hand to retire all outstanding bonds."

The Commissioner argues that in determining whether there existed a statutory event which prevented performance by the company at an earlier date we must look only to the year 1942 and those which followed. We think this is an unrealistic view of the situation and that the whole series of events responsible for the delayed payment must be taken into account. We have not recited in any detail the deplorable financial condition of the company in the years following 1932. There is no point in doing so now because it is indisputable that during that period the company was in a financial condition which would have justified the appointment of a receiver. It

was only because of the drastic steps taken by the company to effect savings, including the reduction of salaries, that the company was enabled to escape such an appointment and perhaps an adjudication in bankruptcy. See Langer's Estate v. Commissioner, 9 Cir., 183 F.2d 758. The agreement between Hinchliff and Sedlack which the company finally performed was a direct result of this unfavorable financial condition. Moreover, to reason that payments to Sedlack should or could have been made immediately after the financial rehabilitation of the company is to overlook the nature of its promise. While, as we have held, the promise to pay was certain, the time of performance was uncertain. Hinchliff testified that Sedlack's salary was to be restored "when the bonds were paid off, the owners got a return on their money, and the company's position justified it." Evidently the company, while under a promise to perform, had considerable leeway as to when it would give effect to its promise. As the Tax Court found, its bonds were not paid off until the year 1943. Certainly it was under no obligation to perform prior to that year. By that time, however, its right to do so was stymied by the Wage Stabilization Act. During the years in immediate controversy, the promise which the company had made in the time of its desperate financial condition could not be performed. In fact, as late as December 15, 1944, the Stabilization Unit had denied the company's request to make increased payments to Sedlack for the years 1942, 1943 and 1944. During those years, it was the fault of neither the company nor Sedlack that the promised payments were postponed.

In the recent case of Thompson v. Commissioner, 4 Cir., 1953, 203 F.2d 820, Sec. 107(d) was involved. There, the court reversed a decision of the Tax Court which had held, as it did here, that the taxpayer was not entitled to relief under that section. In doing so, the court among other things stated, 203 F.2d 825:

"The statute is remedial in nature and should be liberally construed to give effect to its intention to protect an employee, who has been denied payment of his wages when they were due, from the payment of a heavier tax than would have been imposed if the employer had promptly met his obligations."

We conclude, not without some misgiving, that when all the facts of the case are considered, the event which prevented the payment of Sedlack's back pay was one similar to the "bankruptcy or receivership of the employer." Certainly the event which postponed payment stemmed directly from the deplorable financial condition of the company. Absent such condition, there is every reason to think that the salary of Sedlack would have been not less than $14,000 annually from 1932 until the date of his death. Under the circumstances of the case, it would be well near unconscionable to hold that the taxpayers are not entitled to the benefit of the section relied upon.

The decision of the Tax Court is Reversed.