JOSEPH G. R. ROBILLARD AND MARGARET H. ROBILLARD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 80130. Filed March 13, 1961.

*Joseph G. R. Robillard*, pro se.
*Glen W. Gilson II, Esq.*, for the respondent.

Scott, *Judge:* The Commissioner determined a deficiency of $231.36 in petitioners' income tax for the calendar year 1957. The deficiency results from the determination of the Commissioner that the amount of $1,972.62 received by petitioners in the year 1957 and reported by them as backpay does not qualify as such under the provisions of section 1303 of the Internal Revenue Code of 1954.

FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife, residing in Bessemer, Alabama. They filed their joint Federal income tax return for the calendar year 1957 with the district director of internal revenue at Birmingham, Alabama. Their return had attached thereto a statement showing the amount of $1,972.62 of retroactive adjustment of earnings as being applicable to the years 1955 and 1956 and computing the tax on the basis of allocating $1,023.80 of this amount to the year 1955 and $948.82 to the year 1956.

Joseph G. R. Robillard (hereinafter referred to as petitioner) has been a full-time employee of the Tennessee Coal & Iron Division of the United States Steel Corporation (hereinafter referred to as employer) since 1942. Petitioner's employer furnished him with a Form W-2, showing total wages paid to him during the calendar year 1957 of $9,444.41. Of the amount shown as total wages, the employer stated that the amount of $1,972.62 represented retroactive pay for the period January 1, 1955, through December 1, 1956. This additional pay was paid to petitioner in February 1957. Petitioner's gross income for the year 1957 was $9,480.41.

Petitioner is a member of the United Steelworkers of America (hereinafter referred to as the union). On March 1, 1954, petitioner's employer and the union executed an agreement called "The Inequities Agreement of March 1, 1954." The purpose of this agreement was the institution of a program of job description and reclassification in accordance with the principles set forth in an appendix to the contract in an effort to eliminate intraplant salary and rate inequities. This agreement of March 1, 1954, was made a part of the basic contract between the union and employer dated April 22, 1953, which, by its terms, expired on June 30, 1954.

On July 1, 1954, a new agreement was executed between the union and the employer. This agreement recited that the union, having been designated the exclusive collective-bargaining representative of the employees of the company as defined in section 2, Scope of the Agreement, the company recognized the union as such exclusive representative, and the union made the agreement in its capacity as the exclusive collective-bargaining representative of such employees. Section 2 defines employee as follows: "The term 'employee' as used in this Agreement applies to all individuals occupying salaried clerical and technical jobs in the Company's plants for whom the Union is or may be during the life of this Agreement certified by the National Labor Relations Board as the exclusive collective-bargaining representative; * * *." Section 9 of this agreement with respect to rates of pay contained the following notation: "This Section shall take effect only in accordance with the terms of the Supplemental Agreement dated July 1, 1954."

This supplemental agreement to the July 1, 1954, Basic Salaried Agreement provided, in part, as follows:

2. The parties will complete the program of jointly describing and classifying the jobs in accordance with the Job Description and Classification provisions of the Inequities Agreement dated March 1, 1954. Accordingly, the parties will promptly negotiate:
    a. a job description of each job,
    b. a job classification of each job.

3. Effective at the beginning of the first calendar week commencing after agreement has been reached with respect to the description and classification of substantially all of the jobs (90% or more), all salary rates of pay existing prior to that date and the above-mentioned provisions of Section 9 of the April 22, 1953 Agreement shall be terminated. At the same time, the provisions of Section 9 of the July 1, 1954 Basic Salaried Agreement shall become effective for all present and future incumbents of the respective jobs.

4. If the effective date established under Paragraph 3 above is on or before January 2, 1955, the standard salary scale set forth under Subsection A of Section 9 of the July 1, 1954 Basic Salaried Agreement shall be effective as of July 4, 1954. If the effective date established under Paragraph 3 above is after January 2, 1955, the standard salary scale shall be effective as of a date which is equivalent to 13 bi-weekly periods (six months) prior to the beginning of the first calendar week commencing after substantially all (90% or more) of the job descriptions and classifications are agreed to.

Paragraph C of section 9 of the agreement of July 1, 1954, provided in part:

When and if from time to time the Company, at its discretion, establishes a new job or changes the job content (requirements of the job as to training, skill, responsibility, and working conditions) of an existing job to the extent of one full job class or more, a new job description and classification for the new or changed job shall be established in accordance with the following procedure:

1. Management will develop a description and classification of the job in accordance with provisions of the March 1, 1954, Agreement between the parties hereto.

2. The proposed description and classification will be submitted to the grievance committee for approval, and the standard salary scale rate for the job class to which the job is thus assigned shall apply in accordance with the provisions of Subsection B of this Section.

3. If management and the grievance committee are unable to agree upon the description and classification, management shall install the proposed classification, and the standard salary scale rate for the job class to which the job is thus assigned shall apply in accordance with the provisions of Subsection B of this Section. The employee or employees affected or the grievance committee may at any time within 30 days file a grievance alleging that the job is improperly classified under the job description and classification procedure of the March 1, 1954, Agreement between the parties hereto. Such grievance shall be processed under the grievance and arbitration procedures of this Agreement and settled in accordance with the job description and classification provisions of the aforesaid March 1, 1954 Agreement. If the grievance is submitted to the arbitration procedure, the decision shall be effective as of the date when the disputed job description and classification were put into effect.

Section 18 of the agreement of July 1, 1954, provided in part:

A. The agreements of the parties contained in this Basic Agreement shall become effective as at July 1, 1954, and shall continue in effect to and including midnight of June 30, 1956, provided, however, that the agreement of the parties upon salary rates shall terminate as of June 30, 1955, if either party gives notice to the other party pursuant to Paragraph C of this Section 18.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

C. Either party may on or before May 1, 1955, give notice to the other party of the desire of the party giving such notice to negotiate with respect to salary rates to be effective after June 30, 1955. If such notice is given, the parties shall meet within 30 days after May 1, 1955, to negotiate with respect to such matter. \* \* \*

A memorandum agreement, dated June 30, 1955, entered into between the employer and the union, constituted settlement of the negotiations between the parties with respect to salary rates of pay to be effective after June 30, 1955, for salaried clerical and technical employees in accordance with section 18 of the Basic Agreement of the parties dated July 1, 1954. The memorandum agreement dated June 30, 1955, provided in part:

2. Occupational salaries and salary ranges in effect on June 30, 1955 under the Supplemental Agreement to the July 1, 1954 Basic Salaries Agreement, Tennessee Coal and Iron Division, shall be increased by 2.7 per cent of such rates and by an amount equivalent to 11.5 cents per hour. *If the effective date established under Paragraph 3 of the Supplemental Agreement to the July 1, 1954 Basic Salaried Agreement is after October 1, 1955, the standard salary scale shall be effective as of January 1, 1955.* Any retroactive adjustments which may become payable under said supplemental agreement of July 1, 1954, as amended, shall be computed on the basis of a comparison of the standard salary scale applicable to the period in which the hours were paid for and on the basis of the actual salaries paid at that time. [Emphasis added.]

The new agreement of July 1, 1954, continued until its expiration date, June 30, 1956. Upon its expiration 90 percent of the jobs did not have their new descriptions and classifications, but petitioner's

particular position had been classified prior to that time. On June 30, 1956, the union called a strike which ended on August 3, 1956, when a new agreement was signed to establish all the rights and liabilities between the employer and the union as the designated exclusive collective-bargaining representative of the employees of the company as certified by the National Labor Relations Board. The agreement of August 3, 1956, by its terms, expired on June 30, 1959. Section 9 of the agreement of August 3, 1956, carried the notation: "(Subsections A, B, C, and D of this Section shall take effect only in accordance with the terms of the Supplemental Agreement dated August 3, 1956.)"

The Supplemental Agreement to the August 3, 1956, Basic Salaried Agreement provided in part:

1. Effective August 3, 1956, occupational salaries and salary ranges in effect on June 30, 1956, under the Memorandum of Agreement dated June 30, 1955, shall be increased by an amount equivalent to 9.7¢ per hour. Such occupational salaries and salary ranges, together with methods of pay and practices governing the adjustment of individual rates as set forth in Subsections B and C of Section 9 of the April 22, 1953, Agreement shall continue in effect until replaced through the procedure set forth below.

2. The parties will complete the program of jointly describing and classifying the jobs in accordance with the Job Description and Classification provisions of the Inequities Agreement dated March 1, 1954. Accordingly, the parties will continue to negotiate:

    a. a job description of each job,
    b. a job classification of each job.

3. Effective at the beginning of the first biweekly period (in the table of biweekly periods referred to in Paragraph 9 of this Supplemental Agreement) commencing after agreement has been reached with respect to the description and classification of substantially all of the jobs (90% or more), all salary rates of pay existing prior to that date and the above-mentioned provisions of Section 9 of the April 22, 1953, Agreement shall be terminated. At the same time, Subsections A, B, C, and D of Section 9 of the August 3, 1956, Basic Salaried Agreement shall become effective for all present and future incumbents of the respective jobs.

4. When the standard salary scale is installed under the provisions of paragraph 3 above, it is understood that for the purpose of retroactive adjustments, the standard salary scale shall be effective as of January 1, 1955. Any retroactive adjustments which may become payable under this Supplemental Agreement shall be computed on the basis of a comparison of the standard salary scale applicable to the period in which the hours were paid for and on the basis of the actual salaries paid at that time.

Paragraph C of section 9 of the August 3, 1956, agreement was the same as paragraph C of section 9 of the July 1, 1954, agreement in all material respects.

Agreement as to the description and classification of 90 percent of the jobs covered by the agreement between the employer and the union was reached in late 1956 or early 1957.

The amount of $1,972.62 represented a retroactive adjustment for

services rendered by petitioner during the years 1955 and 1956, as allocated by petitioner on his 1957 income tax return, which was paid to petitioner in 1957. The amount of this retroactive adjustment was in excess of 15 percent of petitioner's gross income for 1957. The retroactive adjustment was paid to petitioner in accordance with the provisions of the memorandum agreement of June 30, 1955, and the agreement of August 3, 1956, and would have been paid to petitioner during the years 1955 and 1956 except for the fact that petitioner's employer and the union were unable to agree on the job description and classification of 90 percent of the jobs covered by the agreement between the employer and the union at a date which would have permitted the computation of the amount due for payment to be made earlier than February 1957.

OPINION.

For the retroactive adjustment received by petitioner in 1957 for work performed in 1955 and 1956 to be entitled to the special treatment provided for back pay, it must exceed 15 percent of petitioner's gross income for the year and come within the definition contained in section 1303 (b) of the Internal Revenue Code of 1954.[1] It is obvious that the $1,972.62 is in excess of 15 percent of petitioner's gross income of $9,480.41; therefore, the sole question is whether this retroactive adjustment constitutes backpay within the provisions of section 1303 (b) of the 1954 Code. It is clear that the retroactive adjustment was not ordered, recommended, or approved by a Federal or State agency and was not received by petitioner as a result of any alleged violation by his employer of any State or Federal law. For these reasons, paragraphs (2) and (3) of section 1303 (b) are clearly inapplicable to the facts herein. The fact that section 1303 (b) (2)

---

[1] Sec. 1303 (b). DEFINITION OF BACK PAY.—For purposes of this section, the term "back pay" means amounts includible in gross income under this subtitle which are one of the following—

(1) Remuneration, including wages, salaries, retirement pay and other similar compensation, which is received or accrued during the taxable year by an employee for services performed before the taxable year for his employer and which would have been paid before the taxable year except for the intervention of one of the following events:

(A) bankruptcy or receivership of the employer;

(B) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings;

(C) if the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay such remuneration; or

(D) any other event determined to be similar in nature under regulations prescribed by the Secretary or his delegate.

(2) Wages or salaries which are received or accrued during the taxable year by an employee for services performed before the taxable year for his employer and which constitute retroactive wage or salary increases ordered, recommended, or approved by any Federal or State agency, and made retroactive to any period before the taxable year.

(3) Payments which are received or accrued during the taxable year as the result of an alleged violation by an employer of any State or Federal law relating to labor standards or practices, and which are determined under regulations prescribed by the Secretary or his delegate to be attributable to a prior taxable year.

specifically provides for a circumstance under which retroactive wage or salary payments will meet the definition of backpay does not require a conclusion that an amount denominated by the employer or employee as retroactive pay or a retroactive adjustment may not be entitled to the treatment accorded to backpay if the payment is made under such circumstances as to bring it within the definition of section 1303(b)(1). The denomination by the employer or employee of a payment as "retroactive pay" or "retroactive adjustment" does not remove the amount so paid from the broad classification of "remuneration" as used in section 1303(b)(1) where the amount is paid for services performed.

Since it is undisputed that the amount of $1,972.62 constituted remuneration for services performed by petitioner for his employer prior to the taxable year 1957, the first question to be resolved under section 1303(b) is whether there existed during the years 1955 and 1956 an agreement or legal liability on the employer to pay the amount to petitioner sufficiently binding to permit of a conclusion that the amount would have been paid to petitioner during those years except for the intervention of the circumstance which prohibited the payment in the prior years.

The Commissioner's regulations [2] specifically exclude from backpay compensation paid for prior services where there existed no prior agreement or legal obligation to pay such additional compensation. The necessity for such an agreement or legal obligation has been recognized in a number of cases before the courts. *Cowan* v. *Henslee*, 180 F. 2d 73 (C.A. 6, 1960); *Sedlack* v. *Commissioner*, 203 F. 2d 825 (C.A.

---

[2] Sec. 1.1303–1(b), Income Tax Regs.:

(b) *Definition of back pay*—(1) *Remuneration delayed because of certain events.*—"Back pay" means remuneration including wages, salaries, pensions, retirement pay, and other similar compensation, received or accrued during the taxable year and includible in gross income by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year but for the intervention of any one of the following events:

(i) Bankruptcy or receivership of the employer;

(ii) Dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings;

(iii) If the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay such remuneration; or

(iv) Any other event determined to be similar in nature under this subparagraph. An event will be considered similar in nature to those events specified in subdivision (i), (ii), and (iii) of this subparagraph only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment, except for such circumstances, would have been made prior to the taxable year in which received or accrued.

For the purposes of section 1303 and this section, the term "back pay" does not include remuneration which is deemed to be constructively received in the taxable year or years in which the services were performed, remuneration paid in the current year in accordance with the usual practice or custom of the employer even though received in respect of services performed in a prior year or years, additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation, or any amount which is not includible in gross income under subtitle A of the Internal Revenue Code of 1954.

7, 1953), reversing 17 T.C. 791, and pointing out that this Court had found that no legal obligation existed to pay for the taxpayer's past services but had made no finding that the payments were not made as the result of a prior agreement; and *Estate of Alfred B. Thoreson*, 23 T.C. 462 (1954). The facts in the instant case, in our opinion, clearly show an agreement from October 1, 1955, to pay the additional wages to petitioner. Pursuant to the memorandum of agreement of June 30, 1955, if 90 percent of the job descriptions and classifications had not been completed by October 1, 1955, any retroactive adjustment [3] which might become payable under the July 1, 1954, agreement was to be applicable from January 1, 1955, and a similar provision was carried into the August 3, 1956, agreement.

The respondent argues that this agreement was not binding as to the petitioner since there existed the contingency that the amount might not have been paid to petitioner if petitioner had left his employment with the employer prior to the time when 90 percent of the positions were described and classified. Accepting without specifically approving respondent's construction in this regard of the agreement between the employer and the union, we do not agree that this contingency was such as to require a conclusion that there existed no agreement to pay the additional wages to petitioner. Petitioner did not leave his employment prior to the happening of the event which fixed the date of the payment of the additional wages and the payment to him of such wages was pursuant to the prior agreement of his employer to do so.

It is not sufficient to comply with the statute that it be shown that there was an agreement to pay the additional wages under which such wages would have been paid in the prior years except for the intervention of some circumstance. It must be shown that the circumstance which intervened to prevent the payment is one of those described in subparagraphs (A), (B), (C), or (D) of paragraph (1) of section 1303(b) of the Internal Revenue Code of 1954. Petitioner's employer was not in receivership or bankruptcy, no court proceeding was commenced to enforce payment of petitioner's wages, and petitioner's employer was not the Federal Government, a State, Territory, or political subdivision thereof. The facts in this case, therefore, do not fall within subparagraphs (A), (B), or (C) of paragraph (1) of section 1303(b). The precise question thus becomes whether petitioner comes within the provisions of section 1303(b)(1)(D) permitting the special computation for income from backpay if the amount would have been paid before the taxable year in which payment was made except for the intervention of any other event determined to be similar in nature

---

[3] When the term retroactive adjustment or retroactive pay is used herein, it is to comport with the terminology used by the employer and the union and is not to be confused with retroactive wages or salary as used in section 1303(b)(2) of the Internal Revenue Code of 1954.

under regulations prescribed by the Secretary or his delegate to the events set forth in subparagraphs (A), (B), and (C) of paragraph (1) of section 1303(b).

The Commissioner's regulations[4] provide in this regard that an event will be considered similar in nature to those events specified in subparagraphs (A), (B), and (C) of paragraph (1) of section 1303(b) only if the circumstances are unusual and are of the type specified therein.

In *Thompson* v. *Commissioner*, 203 F. 2d 820 (C.A. 4, 1953), reversing 18 T.C. 742, because of recognizing under the facts there present a settlement out of court to be similar to a court proceeding which this Court had not done, the court said, in speaking of section 107 of the Internal Revenue Code of 1939 which in all material respects is the same as section 1303 of the 1954 Code here involved:

> The statute is remedial in nature and should be liberally construed to give effect to its intention to protect an employee, who has been denied payment of his wages when they were due, from the payment of a heavier tax than would have been imposed if the employer had promptly met his obligation. * * *

Petitioner in the instant case, having been denied payment of his wages when they were due because of a circumstance over which he had no personal control, comes within the scope of the inequity that the statute was designed to remedy. We feel that under a liberal construction of the statute, the event which intervened to defer payment of the retroactive wages to petitioner until 1957 was similar in nature to a dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings. The various agreements between the employer and the union show that the project of job descriptions and classifications was undertaken jointly by the employer and the union. The union was the representative of all the employees including petitioner. The long delay in reaching the job descriptions and classifications for 90 percent of the jobs, considered in conjunction with the provisions in both the July 1, 1954, and August 3, 1956, agreements for arbitration of disputes over new job descriptions and classifications, creates a clear inference that the employer and the union did have disputes over these job descriptions and classifications. We consider these disputes to be similar in nature to a dispute over the liability of the employer to pay the additional remuneration. This dispute was finally resolved to the point that petitioner did receive his additional pay after two negotiated agreements between the employer and the union, one of which was reached only after the calling of a strike which lasted for about 5 weeks. Respondent suggests, without argument, that perhaps in the steel industry a strike is not an unusual event. If re-

---

[4] See footnote 2.

spondent's suggestion in this respect is a serious contention, we consider it to be without merit. The provision of respondent's regulations that the event be unusual must be read in the light of the events specifically provided for in the statute. Receivership, bankruptcy, and institution of court proceedings are all events that occur with sufficient frequency that it is reasonable to expect that there will arise instances in which payment for services rendered is delayed because of the intervention of such events. A strike is unusual to the same extent as is receivership, bankruptcy, or institution of court proceedings and comes within the meaning of unusual in the context of respondent's regulations. It was a combination of the dispute over the job descriptions and classifications and the occurrence of the strike delaying the 1956 agreement from June 30, 1956, when the July 1, 1954, agreement expired, which caused petitioner's additional wages for 1955 and 1956 not to be received until February 1957. This combination of events is similar to a dispute as to the liability to pay the remuneration which is determined after the commencement of a court proceeding, to the same extent that action of the Reconstruction Finance Corporation or the Salary Stabilization Unit of the Bureau of Internal Revenue or the refusal of the Government to permit the use by a corporation of its patents because of the nation being at war, are by their restrictive nature similar to receivership or bankruptcy. Cf. *Norbert J. Kenny*, 4 T.C. 750 (1945); *Newton Dean*, 10 T.C. 672 (1948), and *E. H. Hagner*, 14 T.C. 643 (1950).

In *Thompson* v. *Commissioner, supra,* the Court, in referring to events similar to the commencement of court proceedings, stated:

> There must be some situation similar in nature to the commencement of court proceedings; otherwise, Congress has used meaningless words. Such an event, for example, we think, would be the reference of petitioner's claim against the employer to private arbitration.

Likewise, petitioner's claim, being handled by union arbitration and this arbitration meeting with final success only after a strike was called, is an event similar to the institution of a court proceeding. In *Howard* v. *United States*, 161 F. Supp. 527 (E.D. Ky. 1958), the court held that a taxpayer who was employed by a corporation which was put into the hands of receivers and who served after the commencement of the receivership as an attorney-employee for the receivers had a dispute or something similar thereto with his employer when he agreed to a monthly payment with the understanding that additional compensation for his services would be left open for later determination by the court. In that case, the court stated:

> Unless this disagreement between taxpayer and the receivers is considered a dispute or something similar to a dispute, Subsections (ii) and (iv) become dead letters. It would be difficult to imagine a case to which these subsections could apply if the case at bar is not appropriate. It is true the dispute between the

employer and employee did not result in the commencement of court proceedings. It was, nevertheless, a genuine dispute and court proceedings were unnecessary and could not have, under the circumstances, been instituted. The receivership proceedings furnished the forum in which the dispute could be adequately settled and it was to this agency that the parties applied for determination of the controversy. The motion for the allowance in a pending case involving the issues was an event similar in nature to the commencement of court proceedings. * * *

In the instant case the joint undertaking by the employer and the union to describe and classify jobs to their mutual satisfaction was certainly similar to a dispute, and the union collective-bargaining procedure, as did the receivership proceedings in the *Howard* case, furnished the forum in which the dispute could be adequately settled.

In the instant case the dispute did not specifically involve petitioner as distinguished from the position he occupied and it also involved all of the clerical and technical employees of the employer. The respondent has recognized that it is not necessary that the taxpayer, himself, institute the suit in order to meet the requirements of section 1303(b)(1)(B) of the Internal Revenue Code of 1954 if the pay is received as the result of a suit instituted by another individual similarly situated. See Rev. Rul. 58–33, 1958–1 C.B. 314. In the instant case petitioner's additional wages were received as a result of the proceedings undertaken by the union on behalf of all its members.

We agree with petitioner that he is entitled to compute his tax under the backpay provisions of section 1303 of the Internal Revenue Code of 1954.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

MURDOCK, *J.*, dissenting: The facts do not disclose anything similar to a Court proceeding or bring this case within the provisions of section 1303(b) so that the petitioner can compute his tax under the backpay provision.

WITHEY, MULRONEY, and DRENNEN, *JJ.*, agree with this dissent.