Roy R. BROOKS and Betty B. Brooks,
Appellants,

v.

UNITED STATES of America,
Appellee.

No. 17936.

United States Court of Appeals
Fifth Circuit.

June 22, 1960.

Edward I. Cutler, Tampa, Fla., for appellant.

Abbott Mannie Sellers, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Howard A. Heffron, Acting Asst. Atty. Gen., Robert F. Nunez, Asst. U. S. Atty., Tampa, Fla., Meyer Rothwacks, David O. Walter, Attys., Department of Justice, Washington, D. C., E. Coleman Madsen, U. S. Atty., Miami, Fla., for appellee.

Before RIVES, Chief Judge, WISDOM, Circuit Judge, and SIMPSON, District Judge.

WISDOM, Circuit Judge.

█ This appeal from a judgment denying a refund for income taxes presents the question of a taxpayer's right, under Section 107(d) (2) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 107(d) (2),[1] to spread back over three years a salary paid in one year. The determination of the question turns on whether the events, alleged to have "intervened" causing postponement of the payment of the taxpayer's salary, were "similar in nature" to "bankruptcy or receivership of the employer". The district court entered judgment on a jury verdict for the United States. We hold that the record shows sufficient evidence to support the verdict and that there was no error, as contended, in the trial judge's instructions to the jury.

The taxpayer, Roy R. Brooks,[2] entered the construction business in Tampa, Florida in 1947.[3] His assets consisted of a group of rental houses, $7,000 or $8,000 in cash, and various lots and mortgages. In order to comply with Federal Housing Administration and Veterans Administration requirements for loans, he formed a corporation, Brooks Development Company. He was president, his mother was vice-president, and his secretary (who worked for him less than a year) was secretary and treasurer. The same three constituted the board of directors. Brooks owned all the stock in the corporation, except for one share in the name of his secretary and one share in the name of his mother. He was the corporation: he did the hiring, firing, contracting, selling, and legal work.

Corporate action was informal. There were no formal stockholder meetings and apparently no meetings of the board of directors. The minutes filed as exhibits show meetings of the stockholders February 28, 1947, January 20, 1948, and

---

1. Section 107(d) (1) of the Internal Revenue Code of 1939 allows an individual whose "*back pay*" in any year exceeds fifteen per cent of his gross income for that year to spread back that pay for tax purposes. Section 107(d) (2) defines "*back pay*":

   "For the purposes of this subsection, 'back pay' means (A) remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events; (i) bankruptcy or receivership of the employer; * * * or (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary; * * *".

   Section 29.107–3 of Treasury Regulation 111, as authorized by the statute, provides:

   "An event will be considered similar in nature to those events specified in Section 107(d) (2) (i), (ii), and (iii) only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment, except for such circumstances, would have been made prior to the taxable year in which received or accrued. For the purpose of this section the term 'back pay' does not include remuneration which is deemed to be constructively received in the taxable year or years in which the services were performed, remuneration paid in the current year in accordance with the usual practice or custom of the employer even though received in respect of services performed in a prior year or years, additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation, or any amount which is not includible in gross income under Chapter 1."

   Section 107 was added as a new section in the Internal Revenue Code of 1939 by Section 220(a) of the Revenue Act of 1939, 53 Stat. 878. It was amended by Section 139(a) of the Revenue Act of 1942, 56 Stat. 837, and Section 119 of the Revenue Act of 1943, 58 Stat. 39.

2. His wife, Betty B. Brooks, is a party only because a joint return was filed.

3. Before 1947 Brooks practiced law, worked for the Federal Works Agency, and then entered military service. After leaving the service he returned to Tampa, Florida, and entered the real estate business. He operated through a corporation, Roy R. Brooks, Inc., and received compensation as an officer and employee of the corporation during 1946 and 1947.

January 10, 1950. The minutes of the meeting of February 28, 1947, dictated by Brooks to his secretary, show adoption of a resolution employing Brooks as "General Manager of the business * * * to devote as much time as may be necessary to successfully conduct its business". The minutes contain no direct reference to a salary for Brooks, although a motion was adopted "that none of the other Directors of the corporation shall receive any salary but shall rely upon compensation from dividends". The minutes dated January 20, 1948, however, state that upon motion made and carried "Roy R. Brooks was elected to serve the corporation as General Manager and to be paid a salary of $30,000 per year if and when the corporation had the funds". The secretary did not sign the minutes until 1950, when requested to do so by an attorney later employed by Brooks to handle this tax controversy.

The January 10, 1950, minutes state that the corporation adopted a resolution to pay Roy R. Brooks "past salary in the amount of $25,000 which will cover salaries for the years 1948, 1949, and 1950". In 1951 he filed an amended tax return for 1950 allocating one third of the $25,000 for each of these years.

The minutes of the first stockholders' meeting show that Brooks turned over to the corporation $1500 in cash and that he conveyed certain lots valued at $4,000 in consideration for the issuance of 18 shares of stock to him, one share to his mother, and one share to his secretary, the book value of the stock being fixed at $5500, or $275 a share. The corporation was authorized to begin business with a capital of $500: the taxpayer's position is that the additional money and land transferred for the stock constituted advances by him to the corporation. A financial statement of the corporation prepared for the Bank in 1949 showed these amounts as capital contributions.

The first development project was a group of five houses built in 1947 by a firm of general contractors, Mills & Jones. The corporation supplied the funds for the construction cost, and Mills & Jones did the work for one half of the net proceeds to be realized from the sale of the houses. Prudential Insurance Company lent the corporation $35,000 for the construction of these houses. The construction cost was $3,075 above that figure. There was no delay or default on the payments to Prudential. Payment of the $3,075 owed to Mills & Jones was due in December 1947 or January 1948. It was not paid until late in 1949 or early 1950. The five houses built by Mills & Jones were sold in 1948.

In January 1948 the corporation obtained a series of construction loans in the principal amount of $25,000 from the First Savings and Trust Company of Tampa (now the Marine Bank and Trust Company). The notes, secured by a mortgage, matured on July 15, 1948.

Except for the first five houses, the corporation acted as its own contractor. The next project was also a group of five houses. These were built in 1948, four of which were sold in that year. Funds were still short, however, so Brooks called at the Bank before the mortgage matured in July 1948, and informed the Bank's officers that he had only $300 or $400 in cash and no prospect for immediate sale of the houses. The Bank agreed to extend the mortgage on the condition that Brooks' "withdrawals" except "salaries, dividends, wages * * * or compensation of any form or type will be held within reasonable limits", until liquidation of the loan.[4] Brooks advanced money to the corporation in 1948, drawing no interest. He received no reg-

---

4. By letter addressed to the Marine Bank & Trust Company, dated July 10, 1951, Brooks and the Brooks Development Company, confirmed "our informal agreement * * * that all withdrawals, including such repayments to the undersigned, or either of them, except ordinary day to day business, salaries, dividends, wages, fees, bonuses, commissions and or compensation of any form or type will be held within reasonable limits, and will not be substantially increased without your knowledge and consent; * * *."

ular salary, but he did withdraw some funds from the corporation in 1948.

Late in 1948 Cone Brothers Contracting Company cleared and paved streets on the back part of a tract of land owned by the corporation. In January 1949 their charges of $4,284.97 for this work were due. Brooks was unable to pay this amount at that time and gave a note on January 1, 1949, due on March 31, 1949. There were no funds to pay the note when it matured and it was extended another three months. Payments were made in 1949 and the final payment was completed early in 1950. The original mortgage notes from the Bank were renewed as many as four times, but the Bank continued to finance construction of new houses under the same arrangement with Brooks. The mortgages were fully paid in 1950, more than a year and a half after they became in default.

In the latter part of 1949 the corporation began to make money. Twenty-five houses were built in 1949. Twenty-six houses were sold in 1949, although the sales of some were not finally closed until 1950.

Brooks sued in federal district court for a refund of approximately $2,317.58. The case was tried to a jury that decided Brooks was not entitled to spread back to 1948, 1949, and 1950, the $25,000 he received in 1950. The district judge denied his motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial.

## I.

Brooks contends that the financial difficulties of the corporation constituted "an event * * * similar in nature" to bankruptcy or receivership thereby entitling him to spread back the salary he received from the corporation in 1950. He relies principally on the cases of Norbert J. Kenny, P-H, 4 T.C. 750 (1945); Arthur J. Straus, 14 T.C.Memo. 1328, 24 P-H Tax Court Memo. 55,336 (1955); Langer's Estate v. Commissioner, 9 Cir., 1950, 183 F.2d 758; and Sedlack v. Commissioner, 7 Cir., 1953, 203 F.2d 825, re-versing 17 T.C. 791. We turn now to these cases.

In Kenny the taxpayer was the president and treasurer of his corporate employer. The Reconstruction Finance Corporation conditioned approval of a loan on acknowledgement of its right to restrict the salaries of the corporate officers. In accordance with that restriction, an agreement between the employer and the taxpayer provided that the taxpayer would receive only $7,800 of his $12,000 yearly salary, the rest to be withheld and credited to the taxpayer on the books of the employer. The R.F.C. approved the salary agreement and the corporate employer agreed that the $4,200 of taxpayer's salary withheld would be paid either upon the consent of the R.F.C. or when the loan was fully paid. The Tax Court held that the R.F.C. restrictions on salary payments were similar to restrictions placed upon businesses operating under a receivership, and properly allowed the taxpayer to spread back his salary over three years.

In Straus v. Commissioner, 14 T.C. Memo. 1328, the taxpayer was president and general manager of a corporation and owned substantially all of the outstanding stock. The corporation had a leasehold interest in two office buildings. In order to obtain a permit from the Railroad Commission of Wisconsin to sell bonds, secured by a second mortgage on this leasehold interest, the corporation agreed not to pay salaries to its officers while any of the second mortgage bonds were outstanding. When the corporation paid the taxpayer a salary in 1947 and 1948 the Tax Court allowed him to spread it back, citing the Kenny case. There were other unusual circumstances similar to bankruptcy or receivership distinguishing that case from the instant case: the corporation did not pay any interest or principal on bond issues from 1933 to 1938; the financial condition of the corporation became so precarious that in 1933 trustees were appointed to take over the leases on the two office buildings; the trustees collected the rent and applied the proceeds toward liquidation

of the bonds; in 1938 a reorganization plan was authorized and new trust indentures were negotiated under the terms of which no salaries could be paid until the indebtedness was paid; finally, the corporation was not able to pay off all its debts until 1946.

Langer's Estate v. Commissioner, 9 Cir., 1950, 183 F.2d 758, 760, is one of the leading cases interpreting events similar in nature to bankruptcy or receivership. In that case although the two taxpayers were each entitled to a salary of $600 per month, they received no salary from 1938 through 1942. The employer showed an operating loss for each year during this period. Its buildings, fixtures, and furnishings were subject to a deed of trust and a chattel mortgage, the payments on which were so in default that the creditor could have foreclosed at any time. The court allowed the spread back of the salaries received in 1944 and 1945, stating: "Commodore [the employer], during the years in question, was admittedly insolvent and was operating * * * at the sufferance of Pacific [the mortgagee], which was, at all times, in a position to foreclose its deed of trust and mortgage on the hotel and its furnishings and, in fact, refrained from doing so inasmuch as it appeared that all available revenues were being applied by Commodore toward the payment of its indebtedness to Pacific rather than toward the payment of salaries to the corporate officers. If the situation in which Commodore found itself was not one similar to 'bankruptcy or receivership' within the meaning of the Code, Section 107(d) (2), and the Regulations (Treasury Reg. 111, Section 29.107–3), then those statutory words have no meaning, for the only element of legal bankruptcy lacking was a formal judicial declaration, a determination which the corporation or its creditors could have procured at any time * * *".

In Sedlack v. Commissioner, 7 Cir., 1953, 203 F.2d 825, 830, reversing 17 T.C. 791, the taxpayer was employed from 1928 to 1946 as sales manager for a knitting company. The employer was in financial straits during the depression. Sedlack's normal salary was cut back. In 1943 the employer paid him $5,000 in satisfaction of any legal claim he had against the company. In 1946 the company authorized payment of $18,000 to Sedlack as back salary. The Seventh Circuit held that previous payment of this amount was prevented by events similar to bankruptcy or receivership. The employer was "in a financial condition which would have justified appointment of a receiver." Bankruptcy was avoided only by the reduction of salaries.

The instant case is not analogous to these cases. The financial condition of Brooks Development Company did not justify appointment of a receiver, as in Sedlack. A state of bankruptcy was not so imminent that it required only a formal judicial declaration, as in Langer's Estate. The assets of the Brooks Development Co. Inc., exceeded its liabilities in each of the years in question, even if the so-called "advances" Brooks made are treated as loans rather than capital contributions. Each year the work in progress exceeded the notes and accounts payable. Except in failing to pay two contractors and except for a delay in paying the Bank the construction loan on only one group of five houses out of the thirty-five built in 1947, 1948, and 1949, the corporation met all its obligations currently. The Bank had not foreclosed a mortgage in thirty or forty years, and it did not threaten to do so against the Brooks Development Company. And, notwithstanding the corporation's failure to pay the 1948 loans on time, the Bank continued to make new loans to it for the construction of more houses. In 1949 the Bank recommended Brooks to several creditors as a satisfactory credit risk.[5]

5. March 10, 1949, the Bank wrote Gerber Enterprises:
 " * * * We have known Mr. Brooks, President of Brooks Supply Co., Inc., and also of the Brooks Development Co., Inc. for, perhaps, a dozen years. Our experience has been uniformly satisfactory. Mr. Brooks has had a modest suc-

There is nothing unusual, or in the nature of bankruptcy or receivership, in a new business requiring two or three years to make money. Slow payment of obligation by construction companies and forbearance by the Bank, was the rule, not the exception. George B. Howell, chairman of the Bank's board of directors, testified that ninety per cent of the people in the construction business did not pay a note when it became due. He classified Brooks as in the "average category".

The evidence indicates that the Bank would not have foreclosed the mortgage if Brooks had withdrawn a salary from the corporation; its letter of July 10, 1951, confirming the verbal agreement, in terms permits salaries "within reasonable limits". Mr. Howell could not remember the foreclosure of a mortgage by the Bank and he refused to say what the Bank would have done if Brooks had simply withdrawn a salary. He testified that the Bank expected debtors such as Brooks to withdraw enough money from the business to live decently. The last think the Bank wanted to do was to ask for a receivership.

The facts in the insant case are similar to the facts in Lucilla de V. Whitman, 12 T.C. 324 (1949), affirmed 2 Cir., 178 F. 2d 913. In that case the taxpayer organized a corporation, Countess Mara, Inc., to engage in the men's apparel and specialty necktie business. She owned all the stock, except for a few shares she gave to her daughters, and was the president, treasurer, and sales manager of the corporation. The directors never met. She alone determined what salary she would receive. In 1943 the corporation voted $25,000 for her services from 1938–1943. The Tax Court refused to allow her to spread back this salary. The court expressed an understandable caution that should be observed in dealing with taxpayers who want to spread back salary from a corporation which they own and control: "The recital in the resolution is also subject to close scrutiny due to the fact that the beneficiary of the resolution was largely in control of the corporation and thus in a position to dictate its terms to satisfy its own tax needs." So it is here.

In Estate of Alfred B. Thorenson, 23 T.C. 462 (1954) the taxpayer received $4800 in 1946 as salary from the A. O. Jostad Company which he attempted to spread back to 1932–1935. The taxpayer owned one-third of the stock and was an officer of the Company, which owned and operated a grocery store. In the period from 1932–1935, the company did not have sufficient cash on hand; the depression made it difficult to liquidate inventories and receivables. The taxpayer

---

cess as a business man. * * * Brooks Development Co., Inc., as its name indicates, is a real estate project through which Mr. Brooks is undertaking to market some residential building lots. He has built several houses, all of which, according to our understanding, have been sold. Others are to be erected as fast as purchasers can be obtained. It is our understanding that houses are to be built only as purchasers are found. Apparently, this should be self-liquidating. * * * It has been our pleasure to go along with Mr. Brooks and his interests on various occasions, and maturities have always had satisfactory attention. Understandably, there have been some extensions but usually on a basis satisfactory to the bank. * * *"

October 7, 1949, the Bank wrote Nash-Kelvinator Sales Corp.:

"Our experience with Brooks Development Co. has been entirely satisfactory. Your *(sic)* inquired about them under date of October 6th. Roy Brooks, the president and principal stockholder, (the stock is very closely held) enjoys our confidence. He has had a modest success and we have gone along with him in a rather substantial amount, mainly on a secured basis, but not entirely so. Our extensions have been to the company mentioned as well as to Brooks Supply Co., Inc. and to Mr. Brooks personally. Presently he is building a number of houses, this perhaps being his main operation. We believe that all of the houses have been sold, that permanent financing has been arranged, and that upon completion of closing sufficient profit will have been realized to insure retirement of most of the outstanding obligations. * * *"

contended that these were events similar to bankruptcy or receivership. The Tax Court, refusing to allow a spread back, stated: "We do not think that a low cash basis or slow moving assets alone constitute an event similar to bankruptcy or receivership within the meaning of Section 107(d) (2) (A) (iv)."

In short, on the facts in this case, there was ample evidence from which the jury could conclude that the financial difficulties of the corporation were not so beyond repair as to be similar to the difficulties of a bankrupt.

Other authorities support our conclusion that this case does not present events similar in nature to bankruptcy or receivership. See Harold L. Ward, 25 T.C. 815 (1956), affirmed per curiam, Ward v. Commissioner, 6 Cir., 1957, 240 F.2d 184; Comment, 30 Tul.L.Rev. 496 (1956); 1 Mertens, Law of Fed. Income Taxation Section 6.17; Rabkin & Johnson, Fed. Taxation Section 14.05(4).

## II.

Brooks' other assignments of error attack instructions the district judge gave or refused to give to the jury.

■ A. Brooks complains of the instruction to the jury that the plaintiffs could recover only if they proved an agreement or legal obligation on the part of Brooks Development Company to pay Brooks in 1948 and 1949 the amount which he claims as back pay. Brooks argues that Treasury Regulation 29.107–3 requires a showing of a binding agreement or obligation only as to *additional* compensation. He argues that no such requirement is necessary where there has been *no* payment for earlier years. The distinction between additional compensation and total compensation for services rendered in prior years that appears so obvious to Brooks has not been observed by the various courts interpreting the spread back provisions of the Internal Revenue Code. In Lucilla de V. Whitman, 12 T.C. 324 (1949), affirmed 2 Cir., 178 F.2d 913, the taxpayer had received no compensation for some of the years to which she sought to spread back salary. The Tax Court, denying the spread back, noted that there was no evidence of an obligation on the corporation's part to pay compensation in prior years. The Court did not differentiate between the years in which the taxpayer received no salary and those years in which she received some salary. In Arthur J. Straus, 14 T.C. Memo. 1328, 24 P-H Tax Court Memo. 55, 336 (1955), the taxpayer received no compensation for his services from 1931 to 1940. The Tax Court carefully examined the facts to determine whether there was a prior obligation on the part of the employer to pay the taxpayer for his services during these years.

Citing a number of cases, Mertens states: "The back pay provisions of the 1939 Code have been held not to apply to compensation paid in the current year for services rendered in earlier years when there was no prior agreement or obligation to make the payment." 1 Mertens, Fed. Income Taxation Section 6.17 Volume 4 of C.C.H.Stand.Fed.Tax Rep. 4790 (1956) contains the following statement: "The courts are in agreement that in order to come within the 'back pay' benefit provision there must have been an 'agreement or legal obligation' to pay the amount received as back pay during the years to which the employee desires to allocate the compensation."

In Francis T. Donahoe, 22 T.C. 1276 (1954), a government employee when retiring in 1951 received lump sum payment for leave that he had accumulated prior to 1943. The Tax Court, holding that this did not constitute back pay, stated: "It is now well settled that in order to come within the provision, there must have been an agreement or legal obligation to pay the amount during the years to which the employee desires to allocate the compensation." There were contingencies to the employer's liability for payment of the back pay during the period to which it was allowable, so the Tax Court held that no right to back pay existed during that period.

In Sedlack v. Commissioner, 17 T.C. 791 (1951), the Tax Court held that the taxpayer was not entitled to spread back because there was no legal liability on the part of the employer to pay any compensation in the prior years. The Seventh Circuit reversed the Tax Court and held that as there was a prior agreement it was of no consequence that the payments were not made as a result of a legal obligation. Sedlack v. Commissioner, 7 Cir., 1953, 203 F.2d 825.

We think that the trial judge properly instructed the jury that the plaintiffs must show a prior agreement *or* legal obligation to pay such compensation. See Bavis v. Commissioner, 3 Cir., 1953, 202 F.2d 843, affirming 18 T.C. 418; Cowan v. Henslee, 6 Cir., 1950, 180 F.2d 73; Arthur J. Straus, 14 T.C. Memo. 1328, 24 P-H Tax Court Memo. 55, 335 (1955).

█ █ B. Brooks complains also of the district judge's instruction that the Commissioner's assessment is presumed to be legal and correct, and that the burden of proof is upon the plaintiff to establish by a fair preponderance of the evidence that this assessment is illegal and erroneous. The trial judge's instructions were a correct statement of the law. Niles Bement Pond Co. v. United States, 1930, 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901; cf. Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Bryan v. Commissioner, 5 Cir., 1954, 209 F.2d 822. The trial judge properly refused to give the plaintiffs' requested instruction that the presumption of correctness that attaches to the Commissioner's assessment disappears when any evidence is introduced in rebuttal. The requested instruction was misleading in that it failed to recognize that the burden of proof remained on the plaintiffs.

█ C. Brooks' other complaint is that the trial judge erred in refusing to instruct the jury that an attorney may be an employee within the meaning of the "back pay" provisions of the Internal Revenue Code. This objection is without merit. There was no suggestion throughout the trial that an attorney may not be an employee. As requested, the instruction might have misled the jury into believing that Brooks was entitled to special consideration because he was an attorney.

The evidence supports the verdict, the instructions were correct, and the district judge properly entered judgment denying the refund.

Affirmed.