**Charles E. GRAY and Francis Gray, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. CV–89–N–0770–S.**

United States District Court, N.D. Alabama, S.D.

March 2, 1990.

Samuel R. McCord, Marion Walker, McCord Feldman & Hoffman, P.C., Birmingham, Ala., for plaintiffs.

Frank W. Donaldson, U.S. Atty., Caryl P. Privett, Office of the U.S. Atty., Birmingham, Ala., Cynthia M. Lewis, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

This is a tax refund suit brought pursuant to 28 U.S.C. § 1346(a)(1) in which the plaintiffs seek to recover capital gains taxes, income taxes, a negligence penalty and interest assessed against them for calendar year 1983. Plaintiff Charles E. Gray and his spouse, Francis Gray, filed a joint income tax return for the calendar year 1983. Mrs. Gray is a plaintiff here only because of the joint return.

On the morning the case was called for trial, counsel for the parties announced that both sides wished to waive their right to trial by jury and the case was tried to the court. The case presents three issues for resolution: (1) were gains realized on

sales of certain stock certificates taxable to Charles E. Gray or the children to whom the shares had been previously given; (2) was interest income from a certain certificate of deposit purchased with proceeds from the sale of the stock but issued in the name of Mr. Gray as guardian of one of his children taxable to him or to that child; and (3) did the United States properly impose a negligence penalty against Mr. Gray in connection with his failure to report the gains from the sales of the stock and the interest income as his own income for tax purposes.

## FINDINGS OF FACT

The First National Bank of Clanton, Alabama (First National) was founded in the early years of the twentieth century and, until its sale in 1983, was operated by a single family, the Grimsleys. Until her death in 1979 at an advanced age, a member of the family, referred to in the testimony only as Mrs. Grimsley, was the controlling force at First National. When Mrs. Grimsley died, she was succeeded by her son, A.M. Grimsley, Jr. Though the evidence on the question was somewhat scant, it is clear that first, Mrs. Grimsley and later, A.M. Grimsley, Jr. ran First National with a firm hand.[1] At some point before April 30, 1982, Mr. Grimsley and officers of The Colonial Bank Group, Inc. of Montgomery, Alabama (Colonial) entered into negotiations leading toward the acquisition of First National by Colonial. On April 30, 1982, the president of Colonial and A.M. Grimsley, as president of First National, each signed a letter of intent[2] evidencing an agreement in principle whereby Colonial would acquire First National, either by merger with one of Colonial's subsidiaries or by purchase of at least 80% of the capital stock of First National. The letter of intent provided for a selling price of $1,740.00 per share for a total of $4,350,000.00. Of significance is that part of the letter of intent containing the signature of A.M. Grimsley.

> The undersigned acknowledge as of the 30 (sic) day of April, 1982, that (1) the foregoing is in accordance with their understanding and intentions, (2) they do undertake the representations set forth therein, and (3) they certify that the same was approved by the Board of Directors on 30 (sic) day of April, 1982.
>
> FIRST NATIONAL BANK OF CLANTON
>
> By: <u>A.M. Grimsley, Jr.</u>
>
> As Its President

The minutes of the meetings of First National's board of directors fail to reflect prior approval for the letter of intent, as stated above Mr. Grimsley's signature. Mr. Gray testified that, though he was a member of the board, he was unaware of the proposed acquisition until September 1982.

On September 14, 1982, First National's board of directors and the board of directors of Colonial Bank National Association, a subsidiary of Colonial, approved and entered into an agreement to merge First National with and into Colonial Bank National Association.[3] As did the earlier letter of intent, the agreement provided that the shareholders of First National would receive $1,740.00 for each share of their stock. A meeting of stockholders of First National was noticed for November 30, 1982 and, though not entirely clear from the evidence, the merger was seemingly approved at that meeting.[4] After overcoming or meeting the objections of state bank regulators, the two banks effected the merger in early June 1983.

In 1970 Charles E. Gray, one of the plaintiffs here, acquired five shares of the capital stock of First National at a price of $400.00 per share. Over the succeeding years, he acquired an additional 215 shares at a price of $600.00 each. He became a member of the bank's board of directors in 1976 and owned 220 shares at the time of

---

1. Both Mr. Gray and Stephen C. Mims, a longtime officer of First National, were emphatic in stating that the Grimsleys were in charge.

2. Defendant's Exhibit 1.

3. Defendant's Exhibits 2 and 3.

4. Defendant's Exhibit 3.

the merger. He was then the bank's second largest shareholder. As noted above, Mr. Gray testified that he had no actual knowledge of the then impending merger until September 1982. He did concede that there had been "street talk" for a number of years that the bank would be sold. The court is more than a bit skeptical of the plaintiff's claim that he had no knowledge that the bank would be sold until the meeting of First National's board of directors on September 14, 1982. Ordinarily, one would surmise that a member of the board of directors would be apprised of so important a matter as a proposed merger.

It may well be that the plaintiff had no direct or firm knowledge of the coming merger prior to September 1982. First, the Grimsleys owned approximately 80% of First National's stock and the court is convinced that they retained close control of and likely maintained their own counsel in matters of importance to the bank. Second, minutes of the meetings of the board of directors do not confirm Mr. Grimsley's assertion on the letter of intent that he acted with the prior approval of his board of directors. Finally, Mr. Gray impressed the court as a witness who told the truth as he believed it to be. His memory appeared to be good; he was in a position to know the facts about which he testified; he seemed to understand the questions and responded to them in a direct and forthright manner. Finally, his testimony was not materially contradicted by the other evidence.

Without intimating that Mr. Gray was knowingly or intentionally untruthful, the court, nevertheless, finds that, at the time of the gifts made the basis of this action, he had at least a generalized knowledge that something was afoot with First National.[5]

Mr. Gray had for a number of years prior to 1982 used the professional services of Thomas R. Day, a certified public accountant in Clanton, Alabama. During their professional relationship, Mr. Day had suggested on more than one occasion that Mr. and Mrs. Gray consider an estate plan. On June 3, 1982, as a part of an estate plan recommended by Mr. Day, the plaintiff caused a total of one hundred-fifty shares of his stock in First National to be transferred to his three children, Derek, Mark, and Shannon, with each child receiving fifty shares. The changes were entered on the stock transfer record at First National and three new certificates were issued and delivered to Gray as "Guardian" for each of the children.[6] A fourth certificate was issued to him individually as evidence of his ownership of the remaining seventy shares. At the time of the gifts, Derek was age seventeen, Mark was thirteen and Shannon was eight.

At or about the time of the stock transfers, Mr. Day advised Gray that gift tax returns should be filed but that no tax would be owed. No such returns were ever filed.

Mr. Gray maintained the three stock certificates that had been issued for his children separate and apart from his own property until early June 1983 when they were surrendered as required under the merger agreement with Colonial Bank National Association. Colonial Bank issued three checks in the amount of $87,000 each to Charles Gray as custodian for Derek, Mark and Shannon and one check to Charles Gray individually in the amount of $121,800.00. Mr. Gray deposited the four checks, $382,800.00, in his personal bank account at First National.[7] On June 8, 1983, from funds in his personal accounts, he purchased two certificates of deposit in the face amounts of $100,000 from Colonial Bank National Association. One was issued to "Derek Gray or Charles E. Gray, Gdn." and the other to "Charles E. Gray." Both certificates matured on December 7, 1983. Mr. Gray then used some of the proceeds from the two original certificates of deposit to purchase another certificate in

---

5. The court does not wish to make too much of this factor. Mr. Gray's knowledge is material only to the extent that it implies his intent at the time of the gifts of stock to his children.

6. Plaintiffs' Exhibits 1, 2 and 3.

7. Defendant's Exhibit 4.

the amount of $125,000 which was issued to himself alone.[8] At some unspecified time, he used another $75,000.00 of the proceeds to purchase in his own name a tract of land consisting of 243 acres. From his personal account Mr. Gray paid capital gains taxes of approximately $40,000.00 on his admitted gain from the sale of his seventy shares of First National stock. Except to note that it was used in the construction of "Peach Park,"[9] the court cannot say with certainty what became of the remainder of the original $261,000.00 that represented the proceeds from the First National shares of Derek, Mark and Shannon Gray. Mr. Gray testified, "I intermingled it so I just don't know." Mr. Gray also testified that "Peach Park" is a family owned proprietorship and that each of his three children own an undifferentiated share.

Mr. Gray did not inform his accountant, Mr. Day, of the way in which he had treated the proceeds received from the surrender of his children's stock shares, but Mr. Day testified that had he been so informed it would not have changed the way he prepared the tax returns for Mr. and Mrs. Gray and the three children.

The court finds that Mr. Gray made no inquiry concerning his obligations as custodian of his children's property under Alabama law or the federal tax laws. Specifically, he made no inquiry and, apparently, gave no consideration to the tax consequences of retaining dominion, control and the economic benefits of the property he had transferred to his children.

Derek, Mark and Shannon Gray each filed individual income tax returns for calendar year 1984 and each listed capital gains from the conversion of their First National stock in the amount of $22,800. Derek Gray reported taxable income in the form of interest in the amount of $5,324.51 which represented the interest from the $100,000 certificate of deposit which had been purchased in his and his father's name on June 8, 1983.[10]

As a result of an audit of the Gray's 1983 income tax return, the Internal Revenue Service found that the capital gains that had been reported by Derek, Mark and Shannon Gray and the interest reported by Derek Gray properly should have been reported by Charles E. and Francis Gray and that they were subject to taxation on those gains. The result was a deficiency assessment of $34,451.60 for taxes owed, a negligence penalty of $9,954.75, a failure to pay penalty of $0.19 and interest of $16,403.95, a total of $60,810.49.[11] Because capital gains they had reported were shifted to the returns of their parents, Derek, Mark and Shannon Gray received refunds of $10,307.40, $7,827.56 and $7,687.93 respectively.

Mr. and Mrs. Gray paid the taxes and penalties claimed to be due and, on February 20, 1988, filed an amended income tax return for calendar year 1983 claiming a refund of $34,937.41. The Internal Revenue denied the claim for a refund.

### THE APPLICABLE LAW

■ In a tax refund suit the Commissioner's assessment of tax and penalties is presumed to be correct and the burden of proof is on the taxpayer to show by a preponderance of the evidence that the Commissioner's assessment is erroneous. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Mays v. United States*, 763 F.2d 1295 (11th Cir.1985); *Brooks v. U.S.*, 280 F.2d 370 (5th Cir.1960).

■ Mr. Gray may have made a completed gift of stock to his children under state law [12], however, the question before the

8. Plaintiffs' Exhibit 5.

9. Apparently, "Peach Park" consists of a roadside fruit and vegetable stand which is associated with a restaurant and picnic area.

10. Plaintiffs' Exhibits 6, 7 and 8.

11. Defendant's Exhibit 9.

12. The gift made by Charles Gray to his three children may have been a valid gift under either the Uniform Transfers to Minors Act or the Uniform Gift to Minors Act. The Uniform Transfers to Minors Act (UTMA) § 35–5A–1 et seq. was enacted in 1986 and expanded the scope of the Uniform Gifts to Minors Act (UGMA). The UTMA was made specifically applicable to all transfers made before October 1,

court is not whether the gift was complete under applicable state law, but whether the gift was effective for federal income tax purposes. *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *Anderson v. Commissioner*, 164 F.2d 870 (7th Cir.1947); *see also, Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *Duarte v. Commissioner*, 44 T.C. 193 (1965). Clearly, Mr. Gray retained possession and control of the stock certificates issued to his children. Even more clear is that he retained the economic benefits from the proceeds of the stock surrender. Charles Gray was in fact the economic owner of all the stock and its proceeds thus making all of the income from the stock transfer taxable to him. *Anderson v. Commissioner, supra; Duarte v. Commissioner, supra; Speca v. Commissioner*, 630 F.2d 554 (7th Cir.1980).

In *Anderson*, the donors/taxpayers, partners in a family owned business, transferred ownership of a portion of their stock in the family business to their respective wives and children. Dividends were declared on the stock and on the same day the taxpayers borrowed the dividends from the transferees and executed in exchange 6% demand notes. Subsequently, the taxpayers decided to convert the business from a corporation to a partnership and the stock was liquidated. The Commissioner determined that the transfers were without federal income tax effect, and included in taxpayers' gross incomes the dividends paid. Likewise the Commissioner disregarded the transfers in determining the capital gains realized by taxpayers upon the liquidation distribution. The Tax Court concluded that the alleged gifts were not bona fide for federal income tax purposes. On review and reconsideration of the rulings in the Tax Court, the District Court affirmed and held that the taxpayers did not intend to relinquish dominion and control over the transferred shares of stock, and that the Commissioner's deficiency determinations were valid.

1986 in a form prescribed in the UGMA. The UTMA provides for the transfer of a security to a minor as follows:
§ 35–5A–10. Manner of creating custodial property and effecting transfer; form of transfer; control of custodial property.
(a) Custodial property is created and a transfer is made whenever:
(1) An uncertificated security or a certificated security in registered form is either:
a. Registered in the name of the transferor, an adult other than the transferor, or a trust company, followed in substance by the words: "as custodian for _____ (name of minor) under the Alabama Uniform Transfers to Minors Act"; or
b. Delivered if in certificated form, or any document necessary for the transfer of an uncertificated security is delivered, together with any necessary endorsement to an adult other than the transferor or to a trust company as custodian, accompanied by an instrument in substantially the form set forth in subsection (b). [instrument omitted].
Additionally, the UTMA § 35–5A–12(a)(1) provides that the validity of a transfer made in a manner prescribed in the UTMA is not affected by the failure of the transferor to comply with § 35–5A–10(c) concerning possession and control. Section 35–5A–10(c) directs the transferor to place the custodian in control of the custodial property as soon as practicable.
The Uniform Gift to Minors Act, which was in effect in 1982 when Charles Gray transferred his stock to his three children provided for the gift of a security to a minor as follows:
§ 35–5–3. Manner of making gift.
(a) An adult person may, during his lifetime or by will, make a gift of a security, a life insurance policy or annuity contract or money to a person who is a minor on the date of the gift:
(1) If the subject of the gift is a security in registered form, by registering it in the name of the donor, another adult person or a trust company, followed, in substance, by the words: "as custodian for ...................-...... (name of minor) under the Alabama Uniform Gifts to Minors Act";
(2) If the subject of the gift is a security not in registered form, by delivering it to an adult person other than the donor or a trust company, accompanied by a statement of gift in the following form, in substance, signed by the donor and the person designated as custodian: [statement omitted].
A gift made in a manner prescribed by the UGMA is irrevocable and conveys to the minor indefeasibly vested legal title to the security. § 35–5–4(a).
Because the validity of the gifts made by the plaintiff to his children is not determinative of the issues of income tax and capital gains tax liability, the court expresses no opinion concerning whether the gifts were valid under state law.

After the Tax Court decision, the taxpayers in *Anderson* obtained a declaratory decree in state court that the alleged gifts were valid and bona fide under state law. In response to this decree the District Court stated as follows:

Appellants here contend that the validity of a gift under a state law is determinative of whether the donor remains the substantial owner for purposes of section 22(a) of the Internal Revenue Code. We think this contention is not supported by the decisions. Here we are dealing with the intrafamily gift, and in such case, special scrutiny of the arrangement is necessary lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as section 22(a) is concerned. *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940). That section is not to be circumscribed by refinements of legal title or local law concepts of ownership. By its enactment Congress exercised to the full measure its constitutional power to tax income. *Helvering v. Clifford, supra; Helvering v. Stuart*, 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154; *Douglas v. Willcuts*, 296 U.S. 1, 56 S.Ct. 59, 80 L.Ed. 3, 101 A.L.R. 391; *Irwin v. Gavit*, 268 U.S. 161, 45 S.Ct. 475, 69 L.Ed. 897. The Supreme Court has repeatedly said that taxation is an intensely practical process concerned less with legal formalities than with economic realities and that tax consequences flow from the substance rather than the form of a transaction; that command over property or enjoyment of its economic benefits marks the real owner for federal income tax purposes. See also, *Commissioner v. Tower*, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135; *Harrison v. Schaffner*, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055; *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655; *Corliss v. Bowers*, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; *Coffey v. Commissioner*, 5 Cir., 141 F.2d 204. From these cases *it seems to be quite clear that mere passage of title to income-producing property through de-vices which are valid under state law will not insulate the transferor against federal income tax liability unless the passage of title is accompanied by a complete shift of the economic benefits of ownership, direct and indirect.*

*Anderson*, 164 F.2d at 873. (emphasis added).

■ A part of any income required to be reported on the tax return but which was not so reported due to negligence or "disregard of rules or regulations" is subject to a 5% negligence penalty. 26 U.S.C. § 6653(a)(1). The statute defines negligence as "any failure to make a reasonable attempt to comply with the provisions of this title" and disregard "includes any careless, reckless, or intentional disregard." 26 U.S.C. § 6653(a)(3). A negligence penalty may be imposed upon a taxpayer who negligently fails to do what a reasonable and ordinarily prudent person would do under the particular circumstances. *Kelly v. Commissioner*, T.C. Memo 1970–250, 29 T.C.M. 1090.

### CONCLUSIONS

By retaining the control, dominion and economic benefits derived from the one hundred fifty shares of stock in the First National Bank of Clanton, even though legal ownership of the shares may have been transferred to his children, Charles E. Gray made himself subject to taxation on the gain derived from the sale of such shares and the interest income from the investment of $100,000.00 in the certificate of deposit issued in his name and that of his son, Derek Gray. Furthermore, by failing to consider his obligations with regard to the transferred stock, the plaintiff acted so negligently as to subject himself to the 5% negligence penalty.

For the reasons stated herein, the court is of the opinion that the plaintiffs are due to recover nothing from the defendant. The action should be dismissed and costs should be taxed to the plaintiffs. An appropriate judgment will be entered.